LIVE STOCK EXCHANGE NATIONAL BANK OF CHICAGO, Appellee, v. C. C. IRWIN et al., Appellants.

MARCH 12, 1929.

*Don Barnes* and *Park Chamberlain*, for appellants.

*Wolfe, Wolfe & Claussen*, for appellee.

DE GRAFF, J.—The plaintiff is a national bank, with its legal domicile in the city of Chicago, Illinois. The defendants C. C. Irwin, D. C. Galloway, John Galloway, and J. W. Anderson were directors of the Elwood Savings Bank, Elwood, Iowa. These defendants executed the note in suit, and to secure same, individual mortgages on certain real estate owned by them re-

spectively were executed and delivered to the plaintiff. The respective wives of these mortgagors joined in the execution thereof. In brief, the execution of the note and mortgages is admitted in the answer filed herein. The ownership of the note is stipulated to be in the plaintiff. There is no dispute as to the amount due on the note, which is the amount determined in the decree and judgment of the trial court.

The answer of the defendants traces the antecedent history of the dealings of the plaintiff bank and the directors of the Elwood Savings Bank, which, for the purpose of this case, may be viewed merely as a matter of history. The defendants also plead in their answer fraud and misrepresentation on the part of the plaintiff bank in securing the written instruments material to the consideration of this case.

At the outset, it may be said that there is no proof of fraud or misrepresentation on the part of the officers of the plaintiff bank at the time of the execution of the note and mortgages in suit, or at any other time. On the contrary, the evidence shows the utmost integrity and good faith on the part of the plaintiff bank, and that it exercised remarkable patience in its dealings with the Elwood Savings Bank and its directors and officers, and that the plaintiff bank was guilty of no breach of faith, but attempted to assist the Elwood Bank during its struggle for existence as a financial institution. The Elwood Bank lost in the struggle, and finally merged or sold its assets to the Jackson State Savings Bank of Maquoketa, Iowa, and ceased to do business on December 20, 1920. The fact of the matter is that the defendant directors of the Elwood Bank, with full knowledge of all facts, and after a full and fair discussion of all matters between them and the plaintiff bank, executed a note to plaintiff bank (appellee), and secured the same by mortgages. There is no necessity to go behind the scenes antedating the conversation and transaction at the time the instruments in question were executed and delivered. The defendant directors are precluded and estopped from denying their liability in the instant case. The execution and delivery of the note in suit constitute a settlement of the matters involved under the several guaranty contracts presently noted, and the demand notes executed prior to the time of the execution and delivery of the instruments involved in the case at bar. It must be conceded that the giving

of the note and the mortgages in question, in the absence of fraud, was an admission on the part of the makers of their liability, as evidenced by the instruments executed by them. The Elwood Bank did, through its directors, secure a further extension of time of payment on their then existing liabilities to the plaintiff bank, and obtained further forbearance on the part of the plaintiff bank in enforcing its demands against the appellants.

A brief reference to the antecedent relations of the parties to this action may be helpful in understanding the instant case. The business relations between the two institutions had extended over many years. In 1912, the board of directors of the Elwood Bank passed a resolution authorizing its officers to effect loans with the plaintiff bank and to execute written obligations of the Elwood Bank to evidence such loans and to pledge security for the repayment of such loans and to sell or discount or rediscount with the plaintiff bank any and all bills receivable held by the Elwood Bank.

In 1916, a written contract was executed by the instant appellants and others, except D. C. Galloway, for the purpose of securing a line of credit for the Elwood Bank through the plaintiff bank. By the terms of this contract, the signers thereof guaranteed the prompt payment at maturity of all notes, drafts, bills of exchange, acceptances, and renewals of same that might at any time be discounted or purchased by The Live Stock Exchange National Bank of Chicago for the account, benefit, or use of the Elwood Savings Bank, or whereon the name of the said bank appeared as maker, drawer, acceptor, indorser, or indorser without recourse; waiving presentment for payment, demand, protest, or notice of protest for nonpayment of any such instrument or the renewal of the same. The signers also guaranteed the prompt payment of all overdrafts and other indebtedness of the Elwood Savings Bank to the Chicago bank, together with interest on all said sums at the rate of 7 per cent per annum from maturity until paid. This contract further provided that:

"This guarantee shall remain in force until written notice of its discontinuance shall be received by The Live Stock Exchange Bank of Chicago and until all indebtedness or liability accepted or incurred before receiving notice of the revocation of

this guarantee shall have been fully paid. The undersigned shall be jointly and severally liable upon this guarantee."

This contract, after being signed, was sent by the cashier of the Elwood Bank to the plaintiff bank. It may be observed that this contract was not solicited by the plaintiff, nor were the negotiations which resulted in its execution begun by it. It is undisputed that the negotiations were commenced by the appellant John Galloway.

Following this contract, and on May 20, 1919, a second guaranty contract was executed, signed by all of the defendant directors of the Elwood Bank and others. The language of this second contract is the same as that of the first, except that the rate of interest to be paid on the overdrafts was left blank. There is no suggestion in the record before us that the signature of any person on either contract was secured through fraud or fraudulent representation. It is stipulated that all notes discounted by the plaintiff bank for the Elwood Bank subsequently to the execution of the first guaranty contract were indorsed: "Pay The Live Stock Exchange National Bank without recourse. Elwood Savings Bank, W. S. Hill, Cashier."

The account between the two banks after the execution of the first contract became quite active, and quite a number of notes were discounted, and the proceeds credited to the account of the Elwood Bank. There is no claim that any note that was handled by the plaintiff bank in connection with the Elwood Bank was not sent to the plaintiff bank by a proper officer of the Elwood Bank, or that it was not indorsed by the proper officer of the Elwood Bank, or that it was not credited, less the discount, to the account of the Elwood Bank.

As heretofore noted, on the 20th day of December, 1920, the assets of the Elwood Bank were taken over by a Maquoketa bank. At that time, the plaintiff bank held all of the notes. These were listed in detail, and the list was sent to the defendants. The situation, therefore, stands that, at the closing of the Elwood Bank, all of the papers of that bank held by the plaintiff bank bore the indorsement of the Elwood Bank, and had been discounted for the use and benefit of the Elwood Bank, and fell within the classes of paper covered by the guaranty contracts.

On January 31, 1921, a list of notes was past due, and a note for $31,678, the amount due, was signed by the defendants and

others, with the exception of defendant D. C. Galloway. On April 12, 1921, another group of notes became due, and a demand note for $67,630.05 was signed by the defendants and others, and entered upon the records of the plaintiff bank. It is shown that, upon the receipt by the appellee bank of the demand notes, it then had in its possession the demand notes and the notes originally discounted. As a matter of bank bookkeeping, the plaintiff bank carried on its liability ledger the paper that was past due,—to wit, the demand notes,—and the discounted notes were carried in the bank's register of collateral. This was done in order to avoid confusion in the bank's books. It is undisputed that the plaintiff bank had possession of the demand notes and also the original notes which it had discounted for the Elwood Bank, excepting only such of the discounted notes as were paid by the makers, until the time of the execution of the note in suit.

In passing, it may be said that it was no concern of the appellants' or anyone else how the bank kept its books, provided it kept them in such a manner as would disclose the true situation as to the assets and liabilities. No injury could arise or result to the appellants by the method of bookkeeping adopted by the plaintiff bank.

On April 15, 1921, a letter was sent to J. W. Anderson, one of the defendant directors, in which a list of rediscounted notes for the benefit of the Elwood Bank, under guaranty of payment signed May 20, 1919, was inclosed, and also a demand for payment of the notes referred to in the attached list. Similar letters were written on the same date by the plaintiff bank to D. C. Galloway, John Galloway, and C. C. Irwin, defendant directors. It is conceded that such letters were received in due course of mail by the addressees. Arrangements were then made for a meeting at Maquoketa between the president of the plaintiff bank, Mr. Kiddo, and the Elwood parties. There was a meeting at Maquoketa on April 26, 1921. All of the defendant directors and others connected with the Elwood Bank attended this meeting. The purpose of this meeting was to make arrangements to get a settlement of the line of paper and notes held by the plaintiff bank which found origin through the Elwood Bank. At this conference, all of the various notes which plaintiff bank had received through the Elwood Bank, and which were guaranteed

under the contracts heretofore referred to, were discussed in detail. The plaintiff bank at that time was pressing for a settlement on these notes, and, as testified by the president of the plaintiff bank:

"These gentlemen were giving me their ideas with reference to these various customers' notes, their value, what each one of them possessed in the way of land, just how they stood financially, and represented to me that, if these makers of the various notes had a little time to go on until fall, they figured that they would pay out, and it would be very much to the advantage of these men of Elwood if an extension could be arranged and the indebtedness carried on until fall, and give these makers or customers who made the notes to the bank a chance to liquidate in the regular course of business."

After this conversation, the plaintiff bank agreed to take one note signed by these various gentlemen, and make that note payable on demand, and that "these gentlemen [defendants] would make it their business to see that these customers did pay their notes." Subsequently, the note was prepared and sent back to these directors to be signed. It was signed. The demand notes previously given were returned to Mr. Hill, who was the former cashier of the Elwood Bank. These notes were produced by the appellants upon the trial of this case.

Subsequently, in January, 1922, there was held another conference between certain officers of the plaintiff bank and the Elwood parties. The defendant directors were present at that conference. The plaintiff bank expressed its disappointment in the amount that had been collected and applied on the note, known in the record as "the large note," which resulted from the first conference.

It was at the second conference that the plaintiff bank was advised that these directors had settled with some other banks on some indorsed paper by placing mortgages against their lands, to raise the required funds. That made the plaintiff bank uneasy about its own position, since it was holding an unsecured note. The entire matter of paying the balance on the large note was again discussed, and the plaintiff bank stated that, if possible to do so, security should be given to the plaintiff bank. This was arranged for, and subsequently done. The president testified:

"These men were willing to furnish security. They didn't refuse at all. They said that the only security they would have to give would be their land. We arranged to take the mortgages upon their land."

It was at this time that an attorney, C. L. Ely, was called, and all of these parties went to Mr. Ely's office, and the whole matter was explained to him. It is shown that, at the time of the execution of the mortgages in suit, there had been collections enough on the $104,000 note to reduce it to approximately $70,000. The defendant directors were still claiming, and represented to Attorney Ely, that a little more time "would bring about good deal better results in the collection of the customers' notes, and they needed more time, and they still considered that everything would work out all right." President Kiddo was there, and heard all of the matters under discussion, including the prayer for more time. President Kiddo testified that the defendants said:

"They would give our bank a mortgage on all their lands, —each of them."

Attorney Ely, who was called into the discussion by the defendant directors, took part in the last conference. The Elwood men told Attorney Ely that they were going to give the Chicago bank security in the way of a mortgage, on the indebtedness that they owed the Chicago bank. Ely further testified:

"They [directors] asked me to draw mortgages for that security. They explained to me what was due the Chicago bank, —that is, the form in which it was due,—that is, a promissory note, a large note. They told me what was due on the note."

As a result of this conference and the directions given to Attorney Ely, he did prepare the mortgages, and after their preparation, the mortgagor defendants went to Elwood. The wives of these men signed the mortgages at Elwood. These are the mortgages in suit. It is apparent, from the record, that the time of payment on the large note was extended. The extension of time and the giving of the several mortgages in suit were not separate and distinct transactions. It is further shown that, at the time of the execution of the mortgages, all of the unpaid notes which had been rediscounted by the plaintiff bank were,

under the agreement of the parties, placed in the hands of Attorney Ely for collection; and it is undenied that the defendant directors directed these notes to be turned over to Attorney Ely for collection. Attorney Ely proceeded to work on the liquidation of the notes, with the consent, approval, and under the direction of the Elwood men. Ely testifies:

"All the notes uncollected or not compromised are the notes I produce here. I had many conferences with the defendants, and it was almost daily for a while—particularly with Mr. D. C. Galloway."

It is also shown that the notes of one F. W. Busch, totaling $11,500, were surrendered in consideration of the execution of a deed by said Busch, conveying 800 acres of land near Forest City, Iowa, to the Elwood Bank, and that the notes of F. D. Hill, totaling $11,500, were surrendered upon the execution of a note and mortgage to the four defendant directors for the sum of $7,000. It further appears that the defendant directors exercised complete control over the collection of these notes after the execution of the mortgages, and that these defendants received the benefit of the settlement of certain notes, as heretofore stated.

At the time of the execution of the mortgages in suit, the sum of $74,745.03 was due on the note in suit, and the rediscounted notes were for practically the same amount. It was these rediscounted notes that were turned over to Attorney Ely for collection. At the time of the trial of this case, there remained of the original notes which had not been compromised or disposed of by the Elwood parties two notes, totaling $18,500. It must be held that, by the surrendering of these notes in exchange for deeds to land and for notes and mortgages made out to the appellants subsequent to the execution of the note and mortgages in suit, the defendant appellants have estopped themselves from now questioning the validity of the note and mortgages in suit. In other words, the appellants herein have placed a practical construction upon these contracts that is not consistent with the position they now take and assume. These mortgages were not executed severally, or as separate agreements; but, on the contrary, each mortgage was executed as part of one agreement, by which the makers of the mortgages secured further time of

payment. This constituted, in itself, a sufficient consideration. See *First Nat. Bank of Alta v. Browne*, 199 Iowa 981; *Urdangen v. Fryer*, 183 Iowa 39; *Queal & Co. v. Peterson*, 138 Iowa 514; *Brown v. Jennett*, 130 Iowa 311.

It is claimed by appellants that loans were made to certain directors in excess of the statutory limit. This claim is without merit. See *Benton County Sav. Bank v. Boddicker*, 105 Iowa 548.

A careful study of the record does not disclose any avenue of escape from the liability which the appellants (defendant directors) assumed and evidenced by the note and mortgages in suit. The decree of the trial court is, therefore,—*Affirmed.*

ALBERT, C. J., and STEVENS, MORLING, and WAGNER, JJ., concur.